# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>**CALRISSIAN, LP,**<br><br>　　　　　Debtor. | **CHAPTER 7**<br>Case No. 17-10356-KG |
| **GEORGE L. MILLER, in his capacity as Chapter 7 Trustee for the jointly administered bankruptcy estates of Our Alchemy, LLC and Anderson Digital, LLC,**<br>　　　　　Plaintiff,<br>　　　v.<br>**CALRISSIAN LP,**<br>　　　　　Defendant. | Adv. No. _____<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

**I.    INTRODUCTION**

1. Plaintiff George L. Miller, the Chapter 7 Trustee (the "Trustee") for the jointly administered Chapter 7 bankruptcy estates of Our Alchemy, LLC ("Alchemy") and Anderson Digital, LLC ("Anderson Digital"), by and through his counsel, brings this action to avoid certain fraudulent and/or preferential transfers that were made to the detriment of creditors, including excessive cash payments paid to Calrissian by Alchemy.

2. In all, Alchemy paid over $20.6 million in fraudulent and preferential transfers to, or for the benefit of, Calrissian.

LEGAL\37018292\1

## II.     JURISDICTION AND VENUE

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1334, since the litigation arises under Title 11 of the United States Code (the "Bankruptcy Code"), or in or related to cases under the Bankruptcy Code.

4.     The Trustee demands a jury trial before an Article III judge in connection with all claims asserted herein, and the Trustee does <u>not</u> consent to the entry of final judgment or adjudication by a bankruptcy judge.

5.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1409(a).

## III.    PARTIES

### A.     The Plaintiff

6.     Plaintiff George L. Miller is the duly appointed Chapter 7 Trustee of the Alchemy and Anderson Digital bankruptcy estates. Plaintiff maintains an office at Miller Coffey Tate LLP, 8 Penn Center, Suite 950, 1628 John F. Kennedy Boulevard, Philadelphia, Pennsylvania 19103.

7.     On July 1, 2016 (the "Alchemy Petition Date"), Alchemy and Anderson Digital filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, and the cases are being jointly administered under the caption *In re Our Alchemy, LLC, et al.*, U.S.B.C. D. Del., Case No. 16-11596-KG.

8.     Alchemy, previously known as Millennium Entertainment, was an independent distributor of film and television content across all platforms in North America, including DVD, digital, and video-on-demand platforms. In July 2015, Alchemy agreed to purchase certain physical home video and digital distribution capabilities from ANConnect, LLC (the "ANConnect Transaction"), including, *inter alia*, the purchase of Debtor Anderson Digital, LLC.

**B.  The Defendant**

9.  Defendant Calrissian LP ("Calrissian") is a Delaware limited partnership with its principal place of business at 1201 Howard Avenue, Suite 300, Burlingame, CA 94010. Calrissian is the 100% equity owner and sole member of Alchemy. Calrissian, in turn, is wholly owned and controlled by its general partner Virgo Service Company LLC.

## IV.  FACTS

10.  In 2010, Millennium Entertainment, LLC, now known as Alchemy, was formed as a film distribution and catalog company.

**A.  Virgo, Acting Through Calrissian, Purchases Millennium**

11.  Calrissian was formed as a Delaware limited partnership on August 4, 2014, with Virgo Service Company as its general partner, and Virgo Societas Partnership III (Onshore), LP ("Virgo Onshore), Virgo Societas Partnership III (Offshore), LP ("Virgo Offshore"),[1] and Santa Rita Entertainment, LLC (run by Bill Lee) as its limited partners.

12.  Calrissian was formed for the purpose of purchasing 100% of the membership interests in Millennium Entertainment, LLC. On August 18, 2014, Calrissian and the Virgo Entities entered into a Purchase Agreement with Nu Image Holdings, Nu Image, Inc., and certain other equity holders to purchase all outstanding equity interests in Millennium Entertainment, LLC, for a purchase price of $41 million, $36 million of which was the initial closing payment and the remaining $5 million would be paid over future years.

13.  Calrissian is merely an investment vehicle for Virgo Entities. Calrissian has no operations or employees, has no real assets other than its equity interest in Alchemy and OA

---

[1]  Virgo Service Company, Virgo Onshore, Virgo Offshore, and Virgo Investment Group, LLC are referred to herein, collectively, as the "Virgo Entities."

Investment Holdings, LLC (another Virgo affiliate), and is entirely controlled by the Virgo Entities.

14. After the sale, Calrissian changed the name of Millennium Entertainment, LLC to Our Alchemy, LLC. Per a January 8, 2015 press release, "[t]he rebrand comes five months after a management team led by Lee and private investment firm Virgo Investment Group LLC partnered to acquire the Millennium Entertainment catalog assets and distribution platform from a consortium of investors."

### 1.     Alchemy Makes a $14.5 Million Equity Distribution to Calrissian

15. On August 18, 2014, Calrissian entered into a Promissory Note in favor of Virgo Onshore and Virgo Offshore in the amount of $14,340,000 to partially fund Calrissian's acquisition of Millennium Entertainment from Nu Image, Inc. and other equity holders. Section 4.7 of the Promissory Note states, "Borrower hereby covenants that all proceeds of this Note shall be used solely to make an equity investment in Millennium LLC."

16. On September 4, 2014, less than a month after Calrissian's acquisition of Alchemy had been completed, Alchemy entered into a $40 million credit facility with SunTrust Bank, N.A., which consisted of a $20 million revolver and a $20 million term loan (the "September 2014 SunTrust Facility").

17. Upon the closing of the September 2014 SunTrust Facility, Calrissian – acting through Mark Perez – caused Alchemy to draw $14,539,123.65 out of the SunTrust loan proceeds and transfer that $14,539,123.65 to Calrissian (Alchemy's sole member) as an equity distribution (the "Calrissian Distribution").[2]

---

[2] The Trustee filed a Proof of Claim for this transfer. *See* Claim 2-1, filed March 22, 2018.

18. On September 4, 2014, Mark Perez sent an email confirming receipt of the funds on behalf of "Calrissian / Virgo."

19. This transfer to Calrissian is recorded as a member distribution in Alchemy's books and records.

20. The Calrissian Distribution had the effect of doubling Alchemy's bank debt, from approximately $15 million, to over $31 million.

21. Subsequently, on September 17, 2014, Calrissian made (i) a $7,110,756.29 transfer to Virgo Onshore, and (ii) a $7,411,931.38 transfer to Virgo Offshore, totaling $14,522,687.67. The remaining $16,435.98 (i.e., the remainder of the Calrissian Distribution, after the September 17, 2014 transfers to Virgo Onshore and Virgo Offshore) remained in Calrissian's bank account.

22. Alchemy received no consideration for making the Calrissian Distribution, which rendered Alchemy insolvent and unable to pay its debts as they came due, and left Alchemy with unreasonably small capital.

23. Indeed, as a result of the Calrissian Distribution, which caused Alchemy to become insolvent and left it with unreasonably small capital, Alchemy became inundated with past due notices from creditors, threats of termination of material content supply agreements for non-payment, threats of legal action and was forced to micro manage which third-parties to pay (if at all), and soon defaulted on, *inter alia*, a number of film licensing agreements with Nu Image, Inc. for failing to make participation payments thereunder.

    **2.    Calrissian and the Virgo Entities Are Forced to Inject Capital to Fund Alchemy Operations**

24. The Calrissian Distribution left Alchemy insolvent and with unreasonably small capital for the business in which it was engaged, and in a position where the Virgo Entities were forced to advance funds to keep its operations afloat.

25. In an October 9, 2014 email, Virgo principal Mark Perez expressed concern about Alchemy's "tightened liquidity position" and stressed the "[n]eed to continue to show timely payments," fearing that Virgo would need to "inject interim capital . . . if absolutely necessary to get us through."

26. Perez's fears concerning insufficient capital were well-founded, as Virgo found it "absolutely necessary" to inject capital into Alchemy on multiple occasions throughout the subsequent months.

27. On January 12, 2015, Calrissian, acting at the behest of Virgo and Perez, advanced $3,000,000 to Alchemy (then still known as Millennium Entertainment, LLC) to fund a Promissory Note executed by Millennium in favor of Calrissian. The maturity date was March 28, 2015, seventy-five (75) days from the date of the Note.

28. On March 31, 2015, Our Alchemy transferred $3,051,945.21, which included accrued interest, to Calrissian to payoff the January 21, 2015 Note.

29. Subsequently, on March 31, 2015, Calrissian made (i) a $1,494,326.60 transfer to Virgo Onshore, and (ii) a $1,557,618.60 transfer to Virgo Offshore, totaling $3,051,945.20.

30. A couple months later, on May 21, 2015, Calrissian, acting at the behest of Virgo and Perez, advanced another $3,000,000 to Alchemy, to fund another Promissory Note executed in favor of Calrissian. The maturity date for this Note was again seventy-five (75) days from the date of the Note, on August 4, 2015.

31.     On July 10, 2015, one day after Closing on the ANConnect Transaction, Alchemy transferred $3,033,534.25 (which included accrued interest) to Calrissian to payoff the May 21, 2015 Note.  The funds used to repay the Note were sourced from the increased borrowings under the SunTrust Amended and Restated Loan Agreement funded on July 9, 2015 in connection with the ANConnect and ARC Transactions.

32.     On July 10, 2015, Calrissian made (i) a $1,485,312.03 transfer to Virgo Onshore, and (ii) a $1,548,222.22 transfer to Virgo Offshore, totaling $3,033,534.25.

33.     Although dressed up as purported loans, the January 12, 2015 and May 21, 2015 advances to Alchemy – which came from an insider that dominated and controlled Alchemy's management decisions – were described by that insider as a capital contribution, were not made at arm's length, and were made at a time when Alchemy was insolvent and not adequately capitalized.  In short, the advances are properly characterized as equity, not debt.

34.     With the January 12, 2015 and May 21, 2015 payments from Calrissian to Alchemy properly characterized as equity, the March 31, 2015 and July 10, 2015 payments from Alchemy to Calrissian were made in exchange for less than reasonably equivalent value at a time when Alchemy was insolvent or became insolvent as a result of the payments, and left Alchemy with unreasonably small capital.

35.     The July 10, 2015 payment from Alchemy to Calrissian of $3,033,534.25 was made within one year of the Alchemy Petition Date, to an insider that dominated and controlled Alchemy's management decisions, is the 100% equity owner and sole member of Alchemy, and was aware of Alchemy's tenuous financial position.

### B.     Alchemy Was Insolvent When It Made the Transfers

36.     Liquidity and cash flow were ongoing concerns at Alchemy in the months leading up to the July 2015 closing on the ANConnect Transaction, as the following documents and facts demonstrate:

a.      A January 19, 2015 email from then-CEO Bill Lee including "liquidity" among a list of concerns about the business;

b.      Alchemy's failure to pay Nu Image, Inc. licensing fees as they came due, starting as early as February 27, 2015 and continuing thereafter;

c.      An April 27, 2015 email from Bill Lee describing the SunTrust situation – i.e., the ability to put Alchemy in further debt to keep it afloat – as "Life or death!";

d.      A May 12, 2015 email from Mark Perez to Bill Lee and Jesse Watson describing Alchemy's "cumulative liquidity need" and noting that Alchemy's continued viability was dependent on Virgo's ability to continue injecting cash into the business;

e.      A May 15, 2015 email from Senior VP Jim Jenkins stating that Alchemy was desperately maneuvering towards "keeping out of debtor's prison";

f.      A May 15, 2015 document emailed by Bill Lee to Judd Taylor listing "working capital" as one of the key issues impacting a contemplated transaction with ARC Entertainment (which ultimately closed on the same day as the ANConnect Transaction);

g.      A May 25, 2015 email from Mark Perez stating that "liquidity is an important area to get right and probably easiest to discuss in person";

h.      A May 27, 2015 email from Jesse Watson to Bill Lee, Mark Perez, and Todd Dorfman acknowledging the need to resort to "back up plans" for liquidity and questioning

whether they were "cutting it too close," a reference to Virgo's operation of Alchemy on a shoestring following the Calrissian Distribution;

   i. A June 5, 2015 email from SVP for Business and Legal Affairs Olivia Lerner stating that, due to ongoing issues with paying its vendors on time, Alchemy was "trying to urgently get positive trade references to a company called D&B," and that to do so certain favored vendors would have to be "called and buttered up";

   j. On June 22, 2015, Alchemy defaulted on a $1,000,000 payment due to Toiion, Inc. in connection with the release of an animated picture known as "Dino Time";

   k. A June 24, 2015 email from the co-President of PBSS Distribution to Bill Lee describing "continued problems with getting paid" by Alchemy dating back to March 2015;

   l. A June 25, 2015 email from Anderson Digital co-founder Freyr Thor to Bill Lee stating that "the Alchemy world is spinning at high velocity, we are all working hard to keep it under control"; and

   m. Alchemy's failure to pay nearly $4.4 million owed to FUNimation Productions, Ltd. for DVDs ordered during the first half of 2015.

  37. Disputes between Alchemy and a number of its creditors over unpaid debts had also arisen in the months leading up to the ANConnect Transaction, including a dispute with Nu Image, Inc. (Alchemy's former majority owner) over amounts owed under various licensing agreements.

  38. Just one day after Closing of the APA, on July 10, 2015, Bill Lee emailed a list of "Alchemy priorities," which listed "liquidity/cash management" as one of Mark Perez's main concerns about Alchemy, and listed "[m]anage[ment] [of] negative $5M working capital requirement through September" as Lee's top priority.

39. Almost immediately after the Closing, creditors were contacting Alchemy demanding payment, and within a matter of weeks, Alchemy was in the midst of a crippling liquidity crisis and was unable to meet its obligations as they became due.

40. Contemporaneous communications establish the point, including a July 13, 2015 email in which Alchemy's CFO considers paying Steve Lyon's severance "over a period of time" because Alchemy is "looking for short term liquidity improvement options," and an August 17, 2015 email in which an Alchemy consultant and Alchemy's HR Director discuss a conversation regarding the consultant's past due invoices and states that SVP for Business and Legal Affairs Olivia Lerner told her as a personal favor that, unless she received pre-payment for services rendered to Alchemy, then she should refuse to perform them.

41. In the words of Anderson Digital co-founder Stephen Lyons, it was immediately apparent that "Alchemy's acquisition of Anderson Digital's parent company has been an operational and financial disaster," which left Alchemy "experiencing serious trouble meeting its financial obligations as they come due, [including obligations] to vendors and suppliers which are critical to the company's continued existence." The transaction left the already distressed Alchemy in a state of "financial triage, picking and choosing which of its creditors it will pay," and having difficulty making timely lease and license payments. Lyons was also informed on at least two occasions – including in November 2015 by then-CEO Bill Lee and in February 2016 by Mark Perez – about the Debtors' cash flow problems.

## V.    THE CLAIMS

### FIRST CLAIM – AVOIDANCE AND RECOVERY OF TRANSFERS
### Pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550

42. Paragraphs 1 through 41, above, are incorporated herein by reference, as if restated in their entirety.

43. As set forth in detail above, Alchemy seeks to avoid the following fraudulent transfers and recover the value of each from Defendant (collectively, the "Fraudulent Transfers"):

    a.    $14,539,123.65 transfer to Calrissian on September 4, 2014;

    b.    $3,051,945.21 transfer to Calrissian on March 31, 2015; and

    c.    $3,033,534.25 transfer to Calrissian on July 10, 2015.

44. Each Fraudulent Transfer was a "transfer" within the definition of 11 U.S.C. § 101(54)(D)(i) or (ii).

45. The Fraudulent Transfers occurred within two (2) years of the Alchemy Petition Date.

46. Each of the Fraudulent Transfers was a transfer of property, or of an interest in property, of Alchemy to and/or for the benefit of the Defendant.

47. Alchemy made the Fraudulent Transfer with the actual intent to hinder, delay, and/or defraud Alchemy's creditors.

48. Accordingly, the Fraudulent Transfers constitute avoidable fraudulent transfers pursuant to Section 548(a)(1)(A) of the Bankruptcy Code.

49. As more particularly set forth above, the Defendant was the initial transferee of the Fraudulent Transfers, or the entity for whose benefit the Fraudulent Transfers were made, or, alternatively, the immediate or mediate transferee of such initial transferee.

50. Accordingly, the Trustee is entitled to recover the Fraudulent Transfers or their value pursuant to Section 550 of the Bankruptcy Code.

## SECOND CLAIM – AVOIDANCE AND RECOVERY OF TRANSFERS
**Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550(a)**

51. Paragraphs 1 through 50, above, are incorporated herein by reference, as if restated in their entirety.

52. As set forth in detail above, Alchemy seeks to avoid the Fraudulent Transfers and recover the value of each from Defendant.

53. Each Fraudulent Transfer was a "transfer" within the definition of 11 U.S.C. § 101(54)(D)(i) or (ii).

54. The Fraudulent Transfers occurred within two (2) years of the Alchemy Petition Date.

55. Each of the Fraudulent Transfers was a transfer of property, or of an interest in property, of Alchemy to the Defendant.

56. As more particularly set forth above, Alchemy did not receive reasonably equivalent value in exchange for the Fraudulent Transfers.

57. As more particularly set forth above, the Fraudulent Transfers were made at a time when Alchemy was insolvent (or rendered insolvent as a result of the Fraudulent Transfers), had unreasonably small capital, and/or had incurred (or intended to incur) debts beyond its ability to pay as such debts matured.

58. Accordingly, the Fraudulent Transfers constitute avoidable fraudulent transfers pursuant to Section 548(a)(1)(B) of the Bankruptcy Code.

59. As more particularly set forth above, the Defendant was the initial transferees of the Fraudulent Transfers, or the entity for whose benefit the Fraudulent Transfers were made, or, alternatively, the immediate or mediate transferee of such initial transferee.

60. Accordingly, the Trustee is entitled to recover the Fraudulent Transfers or their value pursuant to Section 550 of the Bankruptcy Code.

## THIRD CLAIM – AVOIDANCE AND RECOVERY OF TRANSFERS
### Pursuant to 11 U.S.C. §§ 547(b) and 550

61. Paragraphs 1 through 60, above, are incorporated herein by reference, as if restated in their entirety.

62. Alchemy seeks to avoid the $3,033,534.25 preferential transfer to Calrissian on July 10, 2015 (the "Preferential Transfer").

63. The Preferential Transfer was a "transfer" within the definition of 11 U.S.C. § 101(54)(D)(i) or (ii).

64. As more particularly set forth above, the Preferential Transfer was made to an insider within the one (1) year period immediately preceding the Alchemy Petition Date.

65. As more particularly set forth above, the Preferential Transfer was made for or on account of an antecedent debt owed before such transfer was made.

66. The Preferential Transfer was made at a time when Alchemy was insolvent.

67. The Preferential Transfers was made to or for the benefit of a creditor, and enabled that creditor to receive more than it would have received if the Preferential Transfer had not been made.

68. Accordingly, the Trustee is entitled to avoid the Preferential Transfer pursuant to Section 547 of the Bankruptcy Code.

69. As more particularly set forth above, the Defendant was the initial transferee of the Preferential Transfer, or the entity for whose benefit the Preferential Transfer was made, or, alternatively, the immediate or mediate transferee of such initial transferee.

70. Accordingly, the Trustee is entitled to recover the Preferential Transfer or its value pursuant to Section 550 of the Bankruptcy Code.

### FOURTH CLAIM – AVOIDANCE AND RECOVERY OF TRANSFERS
### Pursuant to 6 Del. C. §§ 1304(a) & 1305(a), and 11 U.S.C. §§ 544 and 550

71. Paragraphs 1 through 70, above, are incorporated herein by reference, as if restated in their entirety.

72. At all times material hereto, Alchemy had at least one creditor prior to making the Fraudulent Transfers.

73. At all times material hereto, Alchemy was insolvent (or rendered insolvent as a result of the Fraudulent Transfers), had unreasonably small capital, and/or had incurred (or intended to incur) debts beyond their ability to pay as such debts matured.

74. Alchemy did not receive reasonably equivalent value in exchange for the Fraudulent Transfers.

75. Alchemy made the Fraudulent Transfers with the actual intent to hinder, delay, and/or defraud its creditors.

76. Accordingly, the Fraudulent Transfers constitute avoidable fraudulent transfers pursuant to 6 Del. C. §§ 1304(a) and 1305(a), and Section 544 of the Bankruptcy Code.

77. As more particularly set forth above, the Defendant was the initial transferee of the Fraudulent Transfers, or the entity for whose benefit the Fraudulent Transfers were made, or, alternatively, the immediate or mediate transferee of such initial transferee.

78. Accordingly, the Trustee is entitled to recover the Fraudulent Transfers or their value pursuant to Section 550 of the Bankruptcy Code.

## FIFTH CLAIM – AVOIDANCE AND RECOVERY OF TRANSFERS
### Pursuant to 6 Del. C. § 1305(b), and 11 U.S.C. §§ 544 and 550

79. Paragraphs 1 through 78, above, are incorporated herein by reference, as if restated in their entirety.

80. The Trustee seeks to avoid the Preferential Transfer.

81. The Preferential Transfer was made on July 10, 2015, within one year of the Alchemy Petition Date.

82. As the 100% equity owner, sole member, and entity in control of Alchemy, Calrissian is an insider of Alchemy.

83. The Preferential Transfer was made at a time when Alchemy was insolvent.

84. By virtue of its insider status, Calrissian had reasonable cause to believe that Alchemy was insolvent.

85. The Preferential Transfer was made for an antecedent debt.

86. Alchemy had at least one creditor prior to making the Preferential Transfer.

87. Accordingly, the Preferential Transfer constitutes an avoidable transfer pursuant to 6 Del. C. § 1305(b), and Section 544 of the Bankruptcy Code.

88. Calrissian was the initial transferee of the Preferential Transfer, or the entity for whose benefit the transfer was made, or, alternatively, the immediate or mediate transferee of such initial transferee.

89. Accordingly, the Trustee is entitled to recover the Preferential Transfer or its value pursuant to Section 550 of the Bankruptcy Code.

## SIXTH CLAIM – DECLARATORY JUDGMENT

90. Paragraphs 1 through 89, above, are incorporated herein by reference, as if restated in their entirety.

91. An actual controversy exists between the Trustee and Calrissian concerning payments made by Alchemy on March 31, 2015 and July 10, 2015 to Calrissian, which related to purported "loans" made by Calrissian to Alchemy on January 12, 2015 and May 21, 2015.

92. A transaction should be characterized according to its true nature rather than the name given to the transaction by the parties. The January 12, 2015 and May 21, 2015 "loans" were made by Calrissian, an insider that, through the Virgo Entities, dominated and controlled Alchemy's management decisions, at a time when Alchemy was insolvent and had unreasonably small capital – a situation caused by the Calrissian Distribution several months earlier. The Virgo Entities further demonstrated, through their actions, that the January 12, 2015 and May 21, 2015 "loans" represented equity investments and that the Virgo Entities looked to Alchemy's future earnings as the source of repayment of their advances, including by characterizing the advances as injections of interim capital needed to "get [Alchemy] through" its "tightened liquidity position," by dominating and controlling Alchemy's management decisions, and by continuing to advance funds while Alchemy was thinly capitalized or undercapitalized.

93. Based on the facts previously set forth, the Trustee is entitled to declaratory relief, including a declaratory judgment (the "Declaratory Judgment") to the effect that the funds advanced by Calrissian to Alchemy on January 12, 2015 and May 21, 2015 constituted, and should be characterized as, equity investments by Alchemy's controlling member rather than debt.

## VI. **RELIEF REQUESTED**

WHEREFORE, Plaintiff George L. Miller, Chapter 7 Trustee for the jointly administered estates of Our Alchemy, LLC and Anderson Digital, LLC, demands judgment in his favor and against the Defendant:

(a) For avoidance and recovery of the Fraudulent and Preferential Transfers, or the value thereof, in the amount of $20,624,603.11;

(b) Directing the Defendant to immediately pay the Trustee the amount of the Fraudulent and Preferential Transfers, plus interest thereon and costs, and in connection therewith, enter judgment in favor of the Trustee and against Defendant;

(c) The entry of the Declaratory Judgment;

(d) Pre-Judgment and Post-Judgment interest, reasonable attorneys' fees and costs; and

(e) Such additional relief as this Court deems just.

**VII.    JURY DEMAND**

The Trustee demands a jury trial before an Article III Judge in connection with all claims asserted herein.

Dated: June 29, 2018

*/s/ John T. Carroll, III*

John T. Carroll, III (DE No. 4060)
COZEN O'CONNOR
1201 North Market Street
Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2028
Fax: (302) 295-2013
jcarroll@cozen.com

and

Steven M. Coren (*pro hac vice* to be sought)
Benjamin M. Mather (*pro hac vice* to be sought)
Andrew J. Belli (*pro hac vice* to be sought)
KAUFMAN, COREN & RESS, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
Tel: (215) 735-8700
Fax: (215) 735-5170
scoren@kcr-law.com
bmather@kcr-law.com
abelli@kcr-law.com

*Counsel for Plaintiff
George L. Miller, Ch. 7 Trustee for Our Alchemy, LLC, et al.*